## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| AT&T CORPORATION, a New York Corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case Number CIV-05-118-C |
| MATRIX TELECOM, INC., a Texas Corporation, | ) ) ) | |
| Defendant. | ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The litigants tried the instant action before the Court commencing on May 10, 2006, and concluding the following day.  The litigants presented evidence on two causes of action: breach of contract and quantum meruit.  The Court permitted counsel for the litigants to present their closing arguments via post-trial briefs and, in turn, file response briefs.  The Court, upon consideration of the complete record and the applicable law, now finds for Defendant Matrix Telecom, Inc. (Matrix), on Plaintiff AT&T Corporation's (AT&T) breach of contract claim and for AT&T on its quantum meruit claim.  The Court's conclusion is based upon the following findings of fact and conclusions of law.

AT&T is a telecommunications services provider incorporated in New York with its principal place of business in New Jersey.  Matrix is a telecommunications services reseller incorporated in Texas with its principal place of business in Oklahoma.  Matrix, as a citizen of Oklahoma, conducts business within Oklahoma County, State of Oklahoma, and was subject to personal jurisdiction within the Western District of Oklahoma at the time AT&T

commenced the instant action.   The amount in controversy between the litigants is approximately $288,000.00.

In 1995, two companies, Teleport Communications Group, Inc. (TCG), and Executone Information Systems, Inc. (EIS), entered into a contract wherein EIS ordered certain telecommunications services from TCG (the TCG Accounts).  The TCG Accounts involved two types of telecommunications products:  local access and private line.  AT&T acquired TCG and began providing telecommunications services for the TCG Accounts.  Upon AT&T's acquisition, the TCG Accounts were entered into AT&T's Martin Billing System and are now known as "Martin Accounts."

EIS sold the Martin Accounts and, after surviving several subsequent mergers and acquisitions, these accounts ultimately found their way to Matrix's ownership in August 2001.  Neither litigant submitted evidence on whether any of the mergers and acquisitions involved the purchaser assuming all liabilities or were asset purchases only, or that TCG, EIS, or any subsequent purchaser assigned the TCG/EIS contract to a later purchaser.  In addition, neither litigant submitted evidence of the existence of a contract between AT&T and Matrix.

The Martin Accounts are a collection of six individual account numbers:

a.   EXEC-UNIL01 for private line service;
b.   EXEC-DNWW01 (the Dolan Northwest Account) for both private line and local access services;
c.   EXEC-EXEPR01 for local access service;
d.   EXEC-EXW02 for local access service;
e.   EXEC-EXEC03 for both private line and local access service; and
f.   EXEC-EXEWO5 for private line service.

The Martin Account invoices submitted into the record show three distinct categories of charges:  (1) usage charges, (2) monthly recurring charges (MRCs), and (3) other charges consisting of each account's previous balance, surcharges, services charges, and taxes (Other Charges).  Usage charges vary each month because they are determined by the purchaser's actual use of the product in minutes multiplied by the purchaser's negotiated contract price rate.  However, MRCs do not vary each month and are a set price.  Moreover, neither the validity of the MRCs nor Matrix's ability to rebill the MRCs to its customers are disputed.

In mid-2002, AT&T audited Martin Account EXEC-EXW02, and determined that from August 1, 1999, through July 31, 2002, it had underbilled the monthly charges associated with the account in the amount of $59,187.44.   AT&T backbilled the reconciliation amount on Matrix's August 2002 invoice.

Matrix operated, managed, and paid AT&T's invoices for the Martin Accounts from August 2001 through approximately July 2002.  During this time, Matrix received invoices from AT&T in both paper and electronic form.  Matrix also repeatedly requested from AT&T a copy of a contract with a rate schedule for Usage Charges, a Call Detail Report Layout (CDR Layout) for the electronic invoices, and a dedicated account representative to assist with the accounts.  Matrix needed both the rate schedule and the CDR Layout in order to be able to read the electronic invoices, verify that the correct rates were being charged, and subsequently rebill, inter alia, the Usage Charges to its clients.  The lack of both a rate schedule and a CDR Layout prevented Matrix from rebilling the Usage Charges associated with the local access service.  The lack of a contract and a CDR Layout did not, however,

prevent Matrix from rebilling local access MRCs or any charges affiliated with the private line service.  AT&T never provided a rate schedule and failed to provide Matrix with the CDR Layout in a timely fashion.  Nonetheless, Matrix was able to rebill a portion of the AT&T charges to its clients until it ceased doing so in October 2002.

Among the Martin Accounts, the Dolan Northwest Account is unique in that the local access and long distance services were integrated – to disconnect the local access service would also disconnect the long distance service.  Matrix did not want Dolan Northwest's telecommunications services to be interrupted, thus Matrix paid the outstanding invoices through January 2003.  The record is devoid of evidence that Matrix gave notice of its intent to discontinue service and AT&T ultimately disconnected the account in June 2004 for nonpayment.

Beginning in July 2002, Matrix refused to pay any and all AT&T invoices for all services provided in order to get AT&T's attention even though the lack of a CDR Layout did not in any way affect the private line-only accounts.  Matrix never initiated a formal dispute or used AT&T's formal dispute process.  Subsequent to Matrix's refusal to pay, Matrix determined in either July or August 2002 that it would stop reselling all AT&T services.  In late September 2002, Matrix notified its clients that it would be terminating the resale of AT&T services.  However, Matrix's customers were receiving AT&T services until AT&T ultimately disconnected the Martin Accounts for nonpayment.

AT&T became aware either on or before December 2, 2002, that Matrix had advised its customer base of its decision to no longer resell AT&T services even though it had not

-4-

received any request from Matrix to discontinue services.  AT&T escalated its collections efforts but chose not to disconnect the Martin Accounts for nonpayment.  Instead, AT&T delayed the disconnect process in an attempt to establish Matrix's customers as direct AT&T customers.

AT&T also seeks to collect on account no. 055 201 0190 001 (Thrifty Account) for charges relating to long distance, directory assistance, taxes, and surcharges from October 2002 through January 2003.  A Thrifty Account is generally not a resale account.  It is created when an entity has an AT&T local telephone line but makes a long distance call without choosing a long distance provider or setting up a long distance account.  The business name on the Thrifty Account is Executone Business Solutions with a billing address located in Oklahoma City, Oklahoma.  However, AT&T has not proffered evidence linking the Thrifty Account to either a Martin Account or any other book of business under Matrix's ownership.

For its damages calculation, AT&T relies upon two types of evidence:  the actual billed invoices and the "tariff" setting forth interstate rates and rules then in effect for AT&T. Similar to the Thrifty Account, AT&T has not proffered evidence demonstrating that the tariff would be applicable to the types of services provided to Matrix in the Martin Accounts.

## CONCLUSIONS OF LAW

**I.     Jurisdiction, Venue, and Applicable Law.**

Subject matter jurisdiction is present under the diversity statute, 28 U.S.C. § 1332, as the litigants are citizens of different states and the requisite amount in controversy exceeds

$75,000.00 exclusive of interest and costs.  Venue within the United States Court for the Western District of Oklahoma is proper under 28 U.S.C. § 1391(a).  Lastly, in a diversity case, the Court applies the substantive law of Oklahoma, including its choice of law rules. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  Neither AT&T nor Matrix raises the choice of law issue.  In addition, both litigants support their arguments with citation to Oklahoma law.  Therefore, the litigants have acquiesced to the Court's application of Oklahoma law to the claims at issue.  See Flying J Inc. v. Comdata Network, Inc., 405 F.3d 821, 832 n.4 (10th Cir. 2005), cert. denied, ___ U.S. ___, 126 S.Ct. 1331 (2006); Cotracom Commodity Trading Co. v. Seaboard Corp., 189 F.R.D. 655, 666-67 (D. Kan. 1999).

## II.     AT&T's Claim for Breach of Contract.

For breach of contract AT&T must prove (1) the existence of a contract between the litigants, (2) that Matrix breached the contract, and (3) that AT&T suffered damages as a direct result of Matrix's breach.  OUJI 23.1.  AT&T has not shouldered the burden of proof as to the existence of a contract between itself and Matrix, whether by direct negotiation and agreement or by assignment of an existing contract.  Consequently, AT&T's breach of contract claim must fail.

## III.    AT&T's Claim for Quantum Meruit.

### A.     The Martin Accounts.

For quantum meruit AT&T must prove (1) that it furnished valuable services to Matrix with a reasonable expectation of being compensated, (2) that Matrix knowingly accepted the benefit of the services; and (3) that Matrix would be unfairly benefitted by the

services if no compensation were paid to AT&T.   OUJI 23.10.   Here, all elements are met with regard to the Martin Accounts.   AT&T furnished valuable telecommunications services to Matrix beginning when Matrix acquired the Martin Accounts in August 2001.   Matrix managed the Martin Accounts and subsequently paid AT&T's invoices for approximately one year until Matrix began disputing all invoices.   Lastly, manifest unfairness would result if Matrix were allowed to have its clients use AT&T's services, bill its clients, and receive payment from its clients without payment to AT&T.

Nonetheless, under the facts of the case, two exceptions to the foregoing analysis exist.   First, AT&T ceased providing valuable services to Matrix after December 2, 2002, as AT&T only continued to provide services to the Martin Accounts in order to turn Matrix's customers into direct AT&T customers.   Second, with regard to a portion of the backbill invoiced on Martin Account EXEC-EXW02, no evidence exists that, prior to August 2001, Matrix knowingly accepted the benefit of AT&T's services on an account it did not yet own.

### B.     The Thrifty Account.

AT&T's quantum meruit claim wholly fails with regard to the Thrifty Account. AT&T provided the services to the end-user directly and not to Matrix.   The record does not demonstrate that Matrix accepted the benefit of the services or even was aware that AT&T had provided the services to the end-user.   Furthermore, AT&T has not demonstrated that the Thrifty Account is linked to either the Martin Accounts or any other type of account under Matrix's ownership.

C.     **Calculation of the Fair Value of Services Rendered.**

1.     **Time frame for damages.**

With the exception of the Dolan Northwest Account, the period of time for which AT&T furnished valuable services to the Martin Accounts with a reasonable expectation of being compensated, including the backbill portion of Martin Account EXEC-EXW02, is August 2001 through December 2, 2002.  For the Dolan Northwest Account, it would be reasonable for AT&T to continue providing services and expect payment, given Matrix's payment of the outstanding invoices through January 2003 and Matrix's failure to give notice after January 2003 to discontinue services.  Therefore, the proper time frame for calculating damages on the Dolan Northwest Account is from February 2003 through June 2004.

2.     **Damages – Usage Charges, MRCs, and Other Charges.**

AT&T bears the burden of proving the fair value of the telecommunication services it provided to Matrix.  Reynolds v. Conner, 1941 OK 413, ¶ 23, 123 P.2d 664, 668-69; OUJI 23.10.  Due to AT&T's failure to link the tariff to the services provided to Matrix, it is an insufficient basis upon which to either calculate or award damages.  Accordingly, the Court turns to the invoices.

Under the unique facts of the instant action, the fair value of the usage charges is reasonably represented by the billed invoice amount:  Matrix never officially disputed either the rate at which AT&T billed the usage charges or the actual usage charges themselves, but only made requests for billing and contract information on the accounts and for dedicated customer service assistance; Matrix paid AT&T's invoices for approximately one full year

even though Matrix did not have the requested information; Matrix only stopped paying the bills in an attempt to acquire AT&T's attention and obtain the requested information; and Matrix never notified AT&T, either formally or informally, to stop or disconnect the services being provided. As a result, Matrix must pay all usage charges on each Martin Account.

The fair value of all MRCs and their related Other Charges is also reasonably represented by the billed invoice amount. These charges, whether associated with private line or local access services, were unaffected by the missing CDR Layout and could have been rebilled by Matrix to its clients. Indeed, these charges were never in dispute. Therefore, Matrix must pay all MRCs and their related Other Charges.

Using the foregoing methodology, damages are calculated[1] for the following Martin Accounts:

a.   EXEC-UNIL01 –   $13,768.79
b.   EXEC-DNWW01 – $16,567.47
c.   EXEC-EXEPR01 –  $3,302.53
d.   EXEC-EXW02 –   $32,585.11[2]
e.   EXEC-EXEC03 –   $66,586.02
f.   EXEC-EXEWO5 –  $1,637.73
--------------------------------------------------
     SUB-TOTAL –     $134,447.65

---

[1] Using the monthly invoices submitted by AT&T for each Martin Account, the Court added together the Total Current Charges for each month starting with the first unpaid invoice through the December 2002 invoice, added the Previous Balance included on the first unpaid invoice, subtracted all payments made through December 2002, and subtracted all credits given by AT&T to arrive at the total owed for each account.

[2] This amount does not include the August 2002 Total Current Charges invoice amount of $72,856.55.

The August 2002 invoice for Martin Account EXEC-EXW02 contains both that month's charges and the backbill.  The Court is unable to calculate the proper amount of damages for the August 2002 invoice as the backbill contains a lump sum charge for services provided outside the applicable time frame.  As a result, the litigants must confer and attempt to agree on the amount of damages for this one invoice.  If no agreement can be reached, AT&T shall present its evidence to the Court.

## III.   Attorney's Fees and Interest.

In their post-trial briefs, the litigants dispute whether AT&T is entitled to attorney's fees under 12 Okla. Stat. § 936.  The record before the Court does not contain the necessary evidence to adjudicate this matter.  Accordingly, the litigants may address attorney's fees in accordance with Rule 54 and LCvR54.2.  In addition, the litigants may address both prejudgment and postjudgment interest if necessary.  Transpower Constructors v. Grand River Dam Auth., 905 F.2d 1413, 1423 (10th Cir. 1990) (discussing postjudgment interest); Dewey v. State ex rel. Okla. Firefighters Pension & Ret. System, 2001 OK 40, ¶ 21, 28 P.3d 539, 548-49 (discussing prejudgment interest); Williams & Kelley Architects v. Indep. Sch. Dist. No. 1, Okmulgee County, 1994 OK CIV APP 113, 885 P.2d 691, 693-94 (discussing prejudgment interest within context of quantum meruit claim); see Blackwell Oil & Gas Co. v. Mid-Continent Petroleum Corp., 1937 OK 419 ¶¶ 31-34, 79 P.2d 227, 232 (discussing prejudgment interest).

<u>CONCLUSION</u>

AT&T has proven its quantum meruit claim with regard to the Martin Accounts.  The litigants are **DIRECTED** to confer and attempt to agree on the amount of damages resulting from the unpaid August 2002 invoice using the calculation methodology explained above. If consensus is reached, the litigants are **DIRECTED** to file a joint notice with the Court stating the agreed-upon damages amount.  If the litigants are unable to reach a consensus, AT&T is **DIRECTED** to file its specific request, properly supported, for damages under the Court's calculation methodology within twenty days from the date of this Order.  Matrix may file a response within five days thereafter.

Upon the Court's final determination of total damages, Judgment will be entered in favor of AT&T on its quantum meruit claim with regard to the Martin Accounts only.  In all other respects, Judgment will be entered in favor of Matrix.

IT IS SO ORDERED this 4th day of August, 2006.


ROBIN J. CAUTHRON
United States District Judge